# In the United States Court of Federal Claims

No. 18-38C
(Filed: August 20, 2019)

*****************************************

| | |
|---|---|
| STATE OF SOUTH CAROLINA, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

*****************************************

50 U.S.C. § 2566; Appropriations;
Cross-Motions for Summary Judgment;
Economic and Impact Assistance Payments;
Judgment Fund; RCFC 56

<u>Randolph R. Lowell</u>, Columbia, SC, for plaintiff.

<u>Tara K. Hogan</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiff, the State of South Carolina, seeks an award of economic and impact assistance payments for 2016 and 2017 pursuant to 50 U.S.C. § 2566, which directs such payments if the United States Department of Energy ("DOE") fails to meet certain deadlines related to the processing and disposition of surplus defense plutonium stored at the DOE's Savannah River Site ("SRS").[1] Specifically, plaintiff contends that 50 U.S.C. § 2566(d) requires the DOE to pay it $1 million per day, up to a statutory cap of $100 million per year, for a total of $200 million. Both plaintiff and defendant move for summary judgment. For the reasons set forth below, the court grants defendant's motion and denies plaintiff's motion.

## I. BACKGROUND

### A. Facts

Following the end of the Cold War, the United States was challenged with finding a safe, secure method to dispose of large amounts of weapons-grade nuclear material, including weapons-grade plutonium, from both foreign and domestic nuclear weapons production

---

[1] The SRS is a federally owned and operated facility that processes and stores nuclear material in support of national defense, nonproliferation, research, and environmental missions. Pl.'s Mot. App. 145.

facilities. Am. Compl. Ex. 3 at 2. The need to securely store these materials in a safe environment was paramount; however, there was also great promise in reprocessing this material into fuel for nuclear reactors. Id. at 3. If possible, enriched nuclear material would be repurposed into lower-grade fuel, and if the material was not suitable for conversion into fuel, it would be "immobilized" to render it difficult to use as a weapon.[2] Pl.'s Mot. App. 10. To comply with the terms of an agreement with the Russian Federation, which required irradiation to dispose of the material, the DOE determined that the best option would be irradiating the material in a nuclear reactor to degrade it. Id. at 9-10, 13, 19. See generally Am. Compl. Ex. 7.

In early 2000, the DOE selected the SRS to reprocess the material. Pl.'s Mot. App. 68, 77. Simultaneously, the DOE, interested in cost savings through facility closures, wanted to move the plutonium from the Rocky Flats DOE facility near Denver, Colorado, to the SRS. Id. at 82-86. While legislation for these activities was being considered, the governor of South Carolina expressed concern to the DOE regarding the storage of large amounts of weapons-grade nuclear material within the state's borders. Id. at 93-94 (letter from South Carolina Governor Jim Hodges to DOE Secretary Spencer Abraham, dated April 10, 2002). The governor's primary concern was that an agreement brokered between the state and the DOE to remove or reprocess the material would not be legally enforceable:

> I must insist on an ironclad agreement that is fully enforceable in a court of law. The stakes are too high to accept mere political assurances. I will not risk the health and welfare of South Carolina by allowing the enforceability of any agreement to be bound only by federal departmental policy that changes according to political considerations beyond our control.

Id. at 93; see also id. at 103-09 (agreement enclosed in April 11, 2002 letter from DOE Secretary Spencer Abraham to South Carolina Governor Jim Hodges).

Ultimately, on December 2, 2002, Congress enacted a statute, later codified at 50 U.S.C. § 2566, addressing the disposition of weapons-grade plutonium stored at the SRS. See Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 3182, 116 Stat. 2458, 2747-50 (2002) (codified at 50 U.S.C. § 2566 (Supp. III 2004)). The statute provided for the construction and operation of a mixed oxide ("MOX") fuel fabrication facility ("MOX facility") at the SRS to mix the highly enriched nuclear material with depleted uranium oxide to produce fuel for nuclear reactors, id.; the MOX facility was designed to be capable of refining 3.5 metric tons of weapons-grade plutonium annually, Pl.'s Mot. App. 146. The statute further required the DOE to establish a plan to achieve the MOX production objective of "not less than one metric ton of [MOX] fuel per year" by December 31, 2009, and to process thirty-four metric tons of weapons-grade plutonium into MOX fuel by January 1, 2019. § 3182(a)(1)-(2), (g)(1), 116 Stat. at 2747-50. If the DOE did not meet the MOX production objective by

---

[2] Immobilization is a process of encasing fissile material in glass or ceramics, making it stable for storage and difficult to recover for use in a nuclear weapon. Pl.'s Mot. App. 16. Defense plutonium that was converted into fuel would be "irradiated" in a nuclear reactor. Id. Both methods render nuclear material difficult to transport, conceal, and process into a nuclear weapon. Id.

January 1, 2011, it would be required to remove from South Carolina (1) at least one metric ton of unprocessed plutonium by January 1, 2011, and (2) an amount of plutonium equal to the amount of all unprocessed plutonium shipped to the site between April 15, 2002 and January 1, 2017, by January 2017.  Id. § 3182(c)(1)-(2), 116 Stat. at 2749.  The DOE would also be required to remit economic and impact assistance payments to plaintiff in the amount of $1 million per day for each day that certain milestones went unmet, up to a maximum of $100 million per year.  Id. § 3182(d)(1), 116 Stat. at 2749.  These payments would come "from funds available to the Secretary [of the DOE] . . . ."  Id.

In subsequent enactments of the statute, Congress changed deadlines for both MOX processing and material removal, and also changed the funding source for payment of economic and impact assistance.  In 2005, Congress amended 50 U.S.C. § 2566 to make payment of economic and impact assistance "subject to the availability of appropriations."  See Energy and Water Development Appropriations Act, 2006, Pub. L. No. 109-103, § 313(4)(A)(ii), 119 Stat. 2247, 2280-81 (2005).  This language was retained in the versions of the statute reenacted in 2013 and 2014.  See National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 3116, 126 Stat. 1632, 2172-73; Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 3142(f), 128 Stat. 3292, 3900 (2014).  The current version of 50 U.S.C. § 2566 provides that if the MOX production objective was not met, the DOE would be required to remove from South Carolina at least one metric ton of plutonium by January 1, 2016, and an amount of plutonium equal to all unprocessed plutonium shipped to the site from April 15, 2002, to January 1, 2022, no later than January 1, 2022.  See 50 U.S.C. § 2566(c) (2012 & Supp. II 2015).  It further provides that if the DOE missed the January 1, 2016 deadline, the DOE would be required to make economic and impact assistance payments to plaintiff beginning in 2016.  Id. § 2566(d)(1).

In 2002, the DOE began shipping plutonium to the SRS.  Am. Compl. ¶ 41; Answer ¶ 41.  In 2016 and 2017, the DOE failed to achieve the MOX production objective, did not remove one ton of plutonium from South Carolina, and did not provide economic and impact assistance payments to plaintiff as specified in 50 U.S.C. § 2566(d)(1).  Am. Compl. ¶ 45; Answer ¶ 45.

### B.  Procedural History

On January 8, 2018, plaintiff filed a complaint in the United States Court of Federal Claims, seeking $100 million in economic and impact assistance payments it alleges it is owed for 2016, prejudgment and postjudgment interest, costs and attorneys' fees, and any further relief deemed proper.  On March 6, 2018, plaintiff amended its complaint to add a claim for the $100 million of economic and impact assistance payments it alleges is owed for 2017.

Ten days after defendant filed its answer, plaintiff moved for summary judgment.  Defendant then cross-moved for summary judgment.  Briefing is now complete and, deeming oral argument unnecessary, the court is prepared to rule.

## II.  STANDARD OF REVIEW

Both plaintiff and defendant move for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . .") (abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc)); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  However, if neither party satisfies this burden on the filing of cross-motions for summary judgment, then the court must deny both motions.  See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003) ("When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other.").

## III.  DISCUSSION

The parties have differing views concerning the issue now pending before the court. Plaintiff states that the issue is whether the United States is liable to make economic and impact assistance payments for 2016 and 2017 under 50 U.S.C. § 2566(d)(1), and suggests that the funds to satisfy the liability may come from appropriations already authorized or the Judgment Fund.  Pl.'s Mot. Summ. J. 12, 15-16.  Defendant argues that the issue is whether the United States is liable to make economic and impact assistance payments if Congress did not appropriate funds for the payments.  Def.'s Cross-Mot. Summ. J. 7-8.

The parties agree that the DOE has not met critical milestones to process or dispose of plutonium as required by 50 U.S.C. § 2566(d)(1).  Am. Compl. ¶ 45; Answer ¶ 45.  Defendant also agrees that had Congress appropriated funds for economic and impact assistance payments, the DOE would be required to remit those funds to plaintiff in accordance with the statute.  See Def.'s Cross-Mot. Summ. J. 8.  However, the parties disagree as to whether economic and impact assistance payments may be made from:  (1) certain appropriated funds for activities already authorized or funds reprogrammed from those activities; or (2) the Judgment Fund.  See id. at 11-22; Pl.'s Mot. Summ. J. 12, 15-16.  Because these questions turn on the interpretation of law rather than findings of fact, this case is properly before the court on summary judgment.

### A.  Relevant Legal Standards

Central to the parties' competing contentions is the meaning of 50 U.S.C. § 2566(d)(1). Thus, the court turns to the text of that statute to ascertain how it should be construed.  As originally enacted, this section provided:

> (d)  Economic and impact assistance
>
> > (1)  If the MOX production objective is not achieved as of January 1, 2011, the Secretary shall, from funds available to the Secretary, pay to the State of South Carolina each year beginning on or after that date through 2016 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of--
> >
> > > (A)  the date on which the MOX production objective is achieved in such year; or
> > >
> > > (B)  the date on which the Secretary has removed from the State of South Carolina in such year at least 1 metric ton of defense plutonium or defense plutonium materials.

50 U.S.C. § 2566(d) (Supp. III 2004) (emphasis added).

In 2005, the background of 50 U.S.C. § 2566 and the purpose of the economic and impact assistance payments in 50 U.S.C. § 2566(d)(1) was discussed in the United States Senate:

> In a sign of good faith to the State of South Carolina, language was negotiated . . . that required the [DOE] to convert one metric ton of defense plutonium into fuel for commercial nuclear reactors by 2011 or face penalties of $1 million per day up to $100 million per year until the plutonium is either converted into the fuel or removed from the State.  It has never been the intention of South Carolina to receive penalty payments; the residents . . . simply sought reassurances that weapons-grade plutonium would not remain at [the] SRS indefinitely.  South Carolina would not have accepted [the defense] plutonium without this statute.

151 Cong. Rec. S12,745 (daily ed. Nov. 14, 2005) (statement of Sen. Graham).  Later in that session, a "technical correction" to 50 U.S.C. § 2566(d)(1) was proposed:

> It is also my intention to make a technical correction, in the future, to language contained in the conference report to the Fiscal Year 2006 Energy and Water Appropriations Act.  This conference report contains a change to important authorizing language that would make these penalty payments "subject to the availability of appropriations."

Id.  (statement of Sen. Graham).

The technical correction was made to the version of 50 U.S.C. § 2566 enacted in 2005; subsection (d) of that statute provided:

> (d)  Economic and impact assistance
>
> > (1)  If the MOX production objective is not achieved as of January 1, 2014, the Secretary shall, subject to the availability of appropriations, pay to the State of South Carolina each year beginning on or after that date through 2019 for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the later of–
> >
> > > (A)  the date on which the MOX production objective is achieved in such year; or
> > >
> > > (B)  the date on which the Secretary has removed from the State of South Carolina in such year at least 1 metric ton of defense plutonium or defense plutonium materials.

50 U.S.C. § 2566(d) (Supp. V 2006) (emphasis added).

Subsequent versions of 50 U.S.C. § 2566 enacted on January 2, 2013, and December 19, 2014, retained the phrase "subject to the availability of appropriations" in subsection (d)(1).  See 50 U.S.C. § 2566(d)(1) (2012); 50 U.S.C. § 2566(d)(1) (2012 & Supp. II 2015).  Notably, other

parts of the statute remained essentially unchanged from the version originally enacted, with the exception of the deadlines.  For example, 50 U.S.C. § 2566(d)(2)(A) has consistently provided:

> (A)  If, as of January 1, 2022, the MOX facility has not processed mixed-oxide fuel from defense plutonium and defense plutonium materials in the amount of not less than—
>
> > (i)  one metric ton, in each of any two consecutive calendar years; and
> >
> > (ii)  three metric tons total,
> >
> > the Secretary shall, <u>from funds available to the Secretary</u>, pay to the State of South Carolina for economic and impact assistance an amount equal to $1,000,000 per day, not to exceed $100,000,000 per year, until the removal by the Secretary from the State of South Carolina of an amount of defense plutonium or defense plutonium materials equal to the amount of defense plutonium or defense plutonium materials transferred to the Savannah River Site between April 15, 2002, and January 1, 2022, but not processed by the MOX facility.

50 U.S.C. § 2566(d)(2)(A) (2012 & Supp. II 2015) (emphasis added).

If defendant is liable to plaintiff under 50 U.S.C. § 2566(d)(1), funds to satisfy the obligation in the statute must come from a congressionally sanctioned source because, pursuant to the Appropriations Clause of the United States Constitution, the federal government may only spend money that Congress has appropriated.  <u>See</u> U.S. Const. art. I, § 9 cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). Congress may also require that funds only be used for specific programs or purposes.  <u>See</u> <u>Nutt v. United States</u>, 837 F.3d 1292, 1295 (Fed. Cir. 2016) ("According to the Constitution's Appropriations Clause, 'funds may be paid out [by the Treasury] only on . . . the express terms of a specific statute.'" (quoting <u>Office of Pers. Mgmt. v. Richmond</u>, 496 U.S. 414, 432 (1990) (alteration in original))).  If Congress specifies a purpose for appropriated funds, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."  31 U.S.C. § 1301(a) (2012).

If Congress elects to provide unrestricted, or "lump-sum," appropriations to an agency, those appropriations are normally allocated at the agency's discretion.  <u>See</u> <u>Lincoln v. Vigil</u>, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.  After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."); <u>see also</u> U.S. Government Accountability Office, <u>Principles of Appropriations Law—Vol. II</u> ("<u>GAO Redbook</u>") 6-5 (3d ed. 2006) ("A <u>lump-sum appropriation</u> is one that is made to cover a number of specific programs, projects, or items.  (The number may be as small as two.)  In contrast, a <u>line-item appropriation</u> is available only for the specific object

described.").[3]  The normally broad agency discretion to direct lump-sum appropriations may be limited when an agency is bound by a contract; in such circumstances, an agency may not avoid contractually obligated payments if unrestricted, i.e., lump-sum, funds are available.  Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631, 636-38 (2005).  Agency discretion is also limited by line-item appropriations, in which Congress places conditions on how an appropriation may be spent.  To determine whether an expenditure is permitted for a particular line item, agencies perform a "necessary expense" analysis.  See GAO Redbook, supra, at 3-14 to 3-15.  "Under the necessary expense doctrine, '[a]n appropriation made for a specific object is available for expenses necessarily incident to accomplishing that object unless prohibited by law or otherwise provided for.'"  U.S. Dep't of the Navy v. Fed. Labor Relations Auth., 665 F.3d 1339, 1349 (D.C. Cir. 2012) (quoting GAO Redbook, supra, at 4-20).  For an expense to be found necessary, (1) there must be a logical relationship between the expenditure and the appropriation; (2) the expenditure must not be prohibited; and (3) the expenditure must not be provided for in another appropriation.  GAO Redbook, supra at 3-14 to 3-17.

**B.  Plaintiff May Not Receive Economic and Impact Assistance Absent a Congressional Appropriation for That Purpose**

Although plaintiff and defendant agree that the DOE did not comply with the statute, they disagree as to whether any funds are available to satisfy the DOE's statutory obligation.  See Pl.'s Mot. Summ. J. 12, 15-16; Def.'s Cross-Mot. Summ. J. 11-22.  Defendant argues that, absent an appropriation, the DOE is not liable to plaintiff for any payments and, alternatively, that any liability that flows from the statute is limited to the amount Congress appropriated for economic and impact assistance.  Def.'s Reply 1-2, 12.  Plaintiff appears to concede that no funds were specifically appropriated for economic and impact assistance.  See Pl.'s Reply 3.  However, the lack of a specific appropriation does not per se remove the DOE's liability for economic and impact assistance payments.  Rather, defendant's obligation to make economic and impact assistance payments manifested when it failed to comply with the terms of 50 U.S.C. § 2566. See Greenlee Cty. v. United States, 487 F.3d 871, 880 (Fed. Cir. 2007) ("We conclude that defendant's liability for . . . payments was limited to the amounts appropriated by Congress." (emphasis added)).  The question remaining is the extent of defendant's liability, a question that is purely legal in nature.

Plaintiff advances two theories under which the DOE could remit economic and impact assistance payments without an additional congressional appropriation to the DOE:  (1) the DOE could use existing lump-sum appropriations or (2) the DOE could reprogram funds Congress appropriated for other purposes.  Pl.'s Mot. Summ. J. 15-25.  The court examines them in turn.

---

[3] The first three chapters of the GAO Redbook are in the GAO Redbook's fourth edition, while the remaining chapters are in the third edition.  Citations to the GAO Redbook are to the most recent version.

**1.  Congress Did Not Provide Lump-Sum Appropriations in the Consolidated Appropriations Acts of 2016 and 2017**

Under its first theory, plaintiff initially contends that there are lump-sum appropriations available to made the economic and impact assistance payments for 2016 and 2017.  Pl.'s Mot. Summ. J. 15, 22.  It primarily relies on the observation in Greenlee County that the United States Supreme Court ("Supreme Court") addressed the question of "what appropriation amounts are available?" in Cherokee Nation–in the context of a contract case–"that the presence of sufficient unrestricted lump-sum appropriations (not specifically appropriated for the program at issue) to meet the government's contractual obligation qualified as available appropriations."  487 F.3d at 880 & n.3, quoted in Pl.'s Mot. Summ. J. 15.  In essence, plaintiff is suggesting that the principle espoused in Cherokee Nation–that a court can order an agency to use its lump-sum appropriations to satisfy a contractual obligation–should be extended to situations in which the government's obligation is only statutory in nature.  See Pl.'s Reply 6.

Both Greenlee County and a related case, Prairie County, concern a government benefits program enacted to reimburse local governments for lost property tax revenues caused by the federal government's ownership of large amounts of land in their communities.  See Prairie Cty. v. United States, 782 F.3d 685 (Fed. Cir. 2015); Greenlee Cty., 487 F.3d at 871.  Because the federal government does not pay property taxes to local communities, Congress created a "Payment in Lieu of Taxes" ("PILT") program to compensate local governments for lost tax revenue.  Prairie Cty., 782 F.3d at 686; Greenlee Cty., 487 F.3d at 873-74.  Although Congress designated a formula for reimbursing local governments, appropriations for the PILT program were insufficient to reimburse all qualifying communities to the amount yielded by the formula. Prairie Cty., 782 F.3d at 686; Greenlee Cty., 487 F.3d at 874.  Greenlee County and Prairie County, whose compensation fell short when appropriations for PILT were exhausted, separately filed suits in the United States Court of Federal Claims, followed by appeals to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  Prairie Cty., 782 F.3d at 687-88; Greenlee Cty., 487 F.3d at 874-75.

In Greenlee County, the Federal Circuit observed that obligations in contractual relationships were distinguishable from obligations flowing from benefits programs.  487 F.3d at 878-79.  While contractual obligations could not be avoided if unrestricted appropriations were available for payment, noncontractual statutory obligations, i.e., benefits, could be avoided if Congress circumscribed its liability in the statute itself.  See id. at 879 ("The conclusion that [the statute] limits defendant's liability to the amount appropriated is particularly appropriate because [the statute] . . . involves a benefits program not a contract, and 'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." (emphasis added)).  Eight years later, the Federal Circuit in Prairie County again focused on the plain language of the statute:  "Absent a contractual obligation, the question here is whether the statute reflects congressional intent to limit the government's liability . . . or whether [the statute] imposes a statutory obligation to pay the full amount . . . regardless of appropriations by Congress."  782 F.3d at 690 (quoting Star-Glo Assocs., LP v. United States, 414 F.3d 1349, 1355 (Fed. Cir. 2005)).  Even in a contractual relationship, however, payment requires an appropriation.  See Greenlee Cty., 487 F.3d at 878 ("The Supreme Court has noted that, even in the contract context, the 'subject to the availability of appropriations' language means that the government is not contractually bound except to the extent that appropriations are available."

(citing Cherokee Nation, 543 U.S. at 643)); see also id. ("[A] statute creating the right to compensation . . . may restrict the government's liability . . . to the amount appropriated by Congress. . . .  [I]t is undisputed that if [a statute] use[s] the phrase 'subject to the availability of appropriations,' [plaintiff's] right to recover would be limited to the amount appropriated.").

The Federal Circuit has also distinguished between the analysis of language limiting liability in contractual relationships from the analysis of similar language in benefit payment statutes, concluding in the latter that congressional intent plays a larger role:

> [When] the government is not seeking to limit contractual liability, but to limit benefit payments, . . . considerations of predictability are far less significant, and . . . there is greater room to rely on other indicia of Congressional intent, such as legislative history, to ascertain the congressional purpose.

Star-Glo Assocs., LP, 414 F.3d at 1355.

The relationship between the plaintiff and the government in Cherokee Nation was contractual, unlike the relationship between the plaintiff and the government here.  Compare Cherokee Nation, 543 U.S. at 639, with 28 U.S.C § 2566 (2012 & Supp. II 2015).  Plaintiff concedes that defendant's liability in this case is based upon a statute and not a contract.  See Pl.'s Reply 6-7 ("The State has not (yet) asserted a contract claim against the United States. . . . [T]his case is only about DOE's failure to meet its statutory obligation to provide the economic and impact assistance payments. . . .").  In the absence of any binding precedent or other legal support for extending the holding of Cherokee Nation to a purely statutory obligation, the court declines to do so.  Nevertheless, it is necessary to examine whether 50 U.S.C. § 2566 allows for the use of lump-sum appropriations for economic and impact assistance and, if so, whether Congress made such appropriations in the pertinent Consolidated Appropriations Acts.

When a statute creates a right to compensation, but also limits the government's liability to the amount appropriated, the court must determine "whether there are appropriations available to satisfy the government's liability by considering whether the statute in fact limits the government's liability to the amount appropriated," and "what appropriations are available . . . to satisfy that liability."  Greenlee Cty., 487 F.3d at 878.  In this case, the statute conditions defendant's payments to plaintiff as "subject to the availability of appropriations."  50 U.S.C. § 2566(d)(1) (2012 & Supp. II 2015).  This language was first enacted in 2005, well before the DOE's violation of the statute in 2016.  See § 313, 119 Stat. at 2280-81.  Moreover, this specific language is directly addressed in Greenlee County:  "'[S]ubject to the availability of appropriations' is commonly used to restrict the government's liability to the amounts appropriated by Congress for the purpose."  487 F.3d at 878.  Also important is the fact that the less restrictive "from funds available to the Secretary" in the originally enacted version of 50 U.S.C. § 2566(d)(1) was later changed to the more restrictive "subject to the availability of appropriations."  Compare 50 U.S.C. § 2566(d)(1) (Supp. V 2006), with 50 U.S.C. § 2566(d)(1) (Supp. III 2004).

"Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." Lorillard v. Pons, 434 U.S. 575, 580 (1978) (collecting cases). Here, Congress twice reenacted 50 U.S.C. § 2566 following the 2005 addition of the "subject to the availability of appropriations" language and the Federal Circuit's 2007 explanation of that language in Greenlee County, retaining that verbiage each time. See 50 U.S.C. § 2566(d)(1) (2012); 50 U.S.C. § 2566(d)(1) (2012 & Supp. II 2015). The court therefore may presume that Congress was aware that courts interpreted the phrase "subject to the availability of appropriations" as limiting the government's liability to the amount appropriated, and purposely retained this more restrictive language in subsequent reenactments.

Given the above, a plain reading of 50 U.S.C. § 2566(d)(1) evidences Congress's intent that payments for economic and impact assistance can only be made if (1) there is a specific appropriation for that purpose, or (2) there is a lump-sum appropriation that the DOE could use for that purpose. The parties do not dispute that Congress did not appropriate funds for the specific purpose of economic and impact assistance payments. Pl.'s Reply 9; Def.'s Reply 2. Plaintiff argues, however, that funds were available through lump-sum appropriations "legally available" to satisfy statutory obligations. Pl.'s Reply 3.

As plaintiff notes, "Congress appropriated approximately $18.59 billion and $19.69 billion to DOE for its 'Atomic Energy Defense Activities' for fiscal years 2016 and 2017, respectively." Pl.'s Mot. Summ. J. 19; accord Pl.'s Mot. App. 196 (fiscal year 2016), 248-50 (fiscal year 2017). Of those amounts, "Congress directed that approximately $1.9 billion would be for 'Defense Nuclear Nonproliferation' each year." Pl.'s Mot. Summ. J. 19; accord Pl.'s Mot. App. 196 (fiscal year 2016), 250-51 (fiscal year 2017). Congress further directed that the $1.9 billion be allocated to certain, specified programs, including:

- Global Material Security
- Material Management and Minimization
  - Nuclear Material Removal
  - Material Disposition
- Nonproliferation and Arms Control
- Defense Nuclear Nonproliferation R&D
- Nonproliferation Construction

Pl.'s Mot. Summ. J. 19-20; Pl.'s Mot. App. 195. Plaintiff asserts that the funds Congress allocated to these programs were lump-sum appropriations that the DOE could use to make economic and impact assistance payments. Pl.'s Mot. Summ. J. 19-20.

Defendant contends that the funds Congress provided for these programs were not lump sums. See Def.'s Cross-Mot. Summ. J. 13-14. In support of its argument, defendant relies on the 2016 and 2017 Consolidated Appropriations Acts, id., which incorporate, by reference, tables allocating funds for specific programs (as plaintiff recognizes). See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 301(d), 129 Stat. 2242, 2417 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 301(d), 131 Stat. 135, 320; Pl.'s Mot. App. 166; see also Pl.'s Mot. App. 166, 186-201 (containing the tables). Defendant contends that the

"DOE's appropriated funds are limited to the specific purposes and amounts provided in the tables contained within the explanatory statements accompanying the relevant [Consolidated Appropriations Acts]." Def.'s Cross-Mot. Summ. J. 14; see also id. at 15 ("'When an appropriation specifies the purpose for which funds are to be used, 31 U.S.C. § 1301(a) applies in its purest form to restrict the use of the funds for the specified purpose.'" (quoting GAO Redbook, supra, at 4-11)).

Defendant is correct. The tables incorporated by reference into the Consolidated Appropriations Acts specify funding for specific programs, evidencing that the appropriations for Defense Nuclear Nonproliferation and its constituent programs were not lump-sum appropriations, which, by definition, fund multiple programs. GAO Redbook, supra, at 6-5. Plaintiff fails to acknowledge the import of the tables. See Pl.'s Reply 12 ("[T]hese subprogram appropriations are 'lump-sum' appropriations because they 'cover a number of specific programs, projects, or items.'"). Because of Congress's level of precision, the court is not persuaded that these appropriations were in fact "lump-sum appropriations." Consequently, the appropriations could not be used for economic and impact assistance payments.

## 2. Reprogramming Is Not Available for Economic and Impact Assistance Payments

Plaintiff alternatively argues that the economic and impact assistance payments could be provided from other funds that Congress appropriated to the DOE via a discretionary reallocation known as "reprogramming." Id. at 16-17. "Reprogramming" refers to "the shifting of funds within an appropriation to purposes other than those contemplated at the time of appropriation." GAO Redbook, supra, at 2-44. Reprogramming, however, is subject to guidelines to prevent abuse or the allocation of funds to activities that are too far removed from Congress's intended purpose in providing the funds. See id. at 2-44 ("[A]gencies generally are free to reprogram, even if doing so is inconsistent with the budget estimates presented to the Congress, as long as the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation."); see also id. at 2-45 ("Though agencies generally have authority to reprogram funds, Congress may limit this authority."). These limitations accord with the principle that funds appropriated for a particular purpose may not be used for any other purpose. See 31 U.S.C. § 1301(a)-(b).

Defendant argues that reprogramming funds for economic and impact assistance would effectively create a new program or activity because the purpose of economic and impact assistance is substantially different from the purposes of programs identified in the 2016 and 2017 Consolidated Appropriations Acts. Def.'s Reply 11. Defendant notes that those Acts "prohibit DOE from reprogramming funds to create, initiate, or eliminate a 'program, project, or activity.'" Id. (quoting § 301(f)(1), 129 Stat. at 2417; § 301(f)(1), 131 Stat. at 320). Defendant also observes that § 301(d) of each of these Acts incorporates, by reference, a table that specifically allocates appropriations to individual programs, projects, and activities. Def.'s Cross-Mot. Summ. J. 15. Defendant argues that because the purpose of economic and impact assistance payments are not reasonably related to the purposes for which Congress made appropriations in the 2016 and 2017 Consolidated Appropriations Acts, the funds appropriated in those Acts are not available to pay plaintiff or to be reprogrammed to pay plaintiff. Id. at 15-17.

As an initial matter, plaintiff provides no legal support for the proposition that this court has the authority to direct an agency to reprogram funds appropriate for one purpose to another purpose. Nor is the court aware of any.[4] Moreover, even if the court could review an agency's decision to reprogram, or not to reprogram, appropriated funds, the record lacks any evidence indicating whether the DOE considered reprogramming funds or conducted an analysis to determine the feasibility of reprogramming funds. In other words, the court lacks the necessary administrative record to review the propriety of the DOE's decision.

Plaintiff also argues that a "necessary expense" analysis supports its contention that economic and impact assistance payments may be made from appropriations in the 2016 and 2017 Consolidated Appropriations Acts. See Pl.'s Reply at 13-14 ("The determinative issue in this case is whether the statutorily-mandated economic and impact assistance payments have a 'logical,' 'reasonable,' or 'sufficient' relationship to, and therefore constitute a necessary expense of, any of DOE's appropriations."). Id. But plaintiff gets ahead of itself. As noted above, an agency performs a "necessary expense" analysis to determine whether a prospective expenditure comports with appropriations Congress has provided. GAO Redbook, supra, at 3-17. As with its request that the court direct the DOE to reprogram funds to make economic and impact assistance payments, plaintiff provides no legal support for the proposition that the court has the authority to conduct a "necessary expense" analysis, and the court is unable to locate any. Moreover, even if the court could conduct such an analysis, the record lacks evidence that would be necessary for the court to proceed. Thus, the court declines to conduct the analysis.

Ultimately, to the extent that the DOE could exercise its discretion to make economic and impact assistance payments, the payments would need to be consistent with the purpose restrictions in the appropriation to be charged because the DOE is required to obey the restrictions Congress places on appropriations. See Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 200 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation . . . .'" (quoting UAW v. Donovan, 746 F.2d 855, 861 (D.C. Cir. 1984))). In the 2016 and 2017 Consolidated Appropriations Acts, the DOE was restricted from using appropriations to create or initiate a program, project, or activity. Thus, the DOE's reprogramming authority was limited to shifting funds within programs, projects, or activities that already existed. And both parties admit that no appropriations for economic and impact assistance were made in the 2016 and 2017 Appropriations Acts. Consequently, Congress provided the DOE with no mechanism through which it could reprogram funds to make economic and impact assistance payments.

Congress could have appropriated money for economic and impact assistance, or it could have broadened the DOE's discretion to reprogram funds. But it did neither. The court cannot ignore the limiting language in the statute–"subject to the availability of appropriations"–which courts have consistently held to limit government liability. The unique mention of economic and impact assistance payments in 50 U.S.C. § 2566, as well as the detail in the appropriations

---

[4] To the extent that reprogramming decisions are subject to judicial review, they would be reviewable under the Administrative Procedure Act ("APA"), see 5 U.S.C. § 702 (2012), but this court lacks jurisdiction to adjudicate APA claims, see Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997).

Congress provided in 2016 and 2017, persuade the court that had Congress intended to appropriate funds for these payments, it would have made a specific appropriation. There is also evidence in the record that the purpose of the economic and impact assistance payments was to assure plaintiff that weapons-grade plutonium would not be stored at the SRS indefinitely. See Pl.'s Mot. App. 93, 100; see also 51 Cong. Rec. S12,745 (daily ed. Nov. 14, 2005) (statement of Sen. Graham). These facts support the DOE's failure to use existing appropriations to satisfy the obligation resulting from its failure to meet the MOX production objective.

Agencies must comply with the law and, where Congress has given direction on how to do so, agencies are not free to improvise. Although Congress originally provided that the DOE was required to make economic and impact assistance payments "from funds available to the Secretary [of the DOE]," 50 U.S.C. § 2566(d)(1) (Supp. III 2004), it subsequently narrowed the DOE's discretion, providing that economic and impact assistance payments were "subject to the availability of appropriations." 50 U.S.C. § 2566(d)(1) (Supp. IV 2006); 50 U.S.C. § 2566(d)(1) (2012); 50 U.S.C. § 2566(d)(1) (2012 & Supp. II 2015). When Congress originally enacted 50 U.S.C. § 2566, the DOE arguably could have had discretion to reprogram funds to make economic and impact assistance payments, but the court cannot ignore that Congress has since intentionally and consistently restricted the DOE's discretion.

## C. The Judgment Fund Is Not Available for Economic and Impact Assistance Payments

Finally, plaintiff argues that the economic and impact assistance payments could be paid from the Judgment Fund if there are no legally available appropriations. Pl.'s Mot. Summ. J. 12. Plaintiff is incorrect. Pursuant to the Appropriations Clause, "no money can be paid out of the Treasury unless it has been appropriated by Congress." Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937). "The Judgment Fund is a permanent, indefinite appropriation which is available to pay many judicially and administratively ordered monetary awards against the United States." 31 C.F.R. § 256.1(a) (2015); accord 31 U.S.C. § 1304 (providing that the Judgment Fund can be used "to pay final judgments, award compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law"). Significantly, the Judgment Fund may only be used when "payment is not otherwise provided for . . . ." 31 U.S.C. § 1304(a)(1). "Payment is otherwise provided for when another appropriation or fund is legally available to satisfy the judgment." GAO Redbook, supra, at 14-39.

The Judgment Fund was designed to expedite the administration of justice by enabling courts to issue awards without the need to obtain separate appropriations. Slattery v. United States, 635 F.3d 1298, 1316-17 (Fed. Cir. 2011) (en banc); see also United States v. Maryland ex rel. Meyer, 349 F.2d 693, 695 (D.C. Cir. 1965) ("The obvious purposes of the [Judgment Fund] are (1) to enable . . . prompt payment without awaiting a special appropriation, and (2) to relieve the United States of the obligation of paying interest, or of a bad conscience as it were for not doing so, while the principal remains unpaid.").

Plaintiff effectively seeks to exploit the flexibility of the Judgment Fund to circumvent Congress's failure to appropriate funds for economic and impact assistance. But, "[t]he general appropriation for payment of judgments, in any event, does not create an all-purpose fund for judicial disbursement." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 432 (1990).

Two facts are fatal to plaintiff's argument: First, there is clear statutory language limiting the DOE's liability to the amount appropriated, and no funds were subsequently appropriated. Second, there is no contractual relationship available to complement the statutory language and thereby overcome the lack of an appropriation and that limiting language. Given these facts, to resort to the Judgment Fund would ignore the apparent Congressional intent not to appropriate for economic and impact assistance payments.

Congress created a benefit of economic and impact assistance in 50 U.S.C. § 2566 and outlined the circumstances under which plaintiff could receive payment. Congress then did not appropriate funds to make payments, choosing instead to fund other priorities. The record indicates that Congress did make restricted appropriations to the DOE that not only reserved funds for particular purposes, but also prohibited those funds from being used for other, unrelated purposes.

The Judgment Fund is a separate appropriation which is available to furnish awards when other appropriations are not legally available. But plaintiff is not merely asking for a damages award. Plaintiff is effectively asking for the Judgment Fund to be used to create an appropriation where none was made by Congress. Resorting to the Judgment Fund, however, bypasses the case's central question, answered above: Did Congress make any appropriations available to pay economic and impact assistance? The answer is clearly "no." The Judgment Fund cannot be manipulated to change the answer to this question from "no" to "yes." To hold otherwise would enable courts to circumvent congressional decisions not to act. Most importantly, allowing resort to the Judgment Fund in a case where Congress has also clearly limited the government's liability entangles the court in decisions reserved to Congress by the United States Constitution. The court declines to become so entangled.

Under the circumstances of this case, plaintiff's proper course to obtain economic and impact assistance is to request an appropriation from Congress.

## IV. CONCLUSION

As set forth in more detail above, the court **DENIES** plaintiff's motion for summary judgment and **GRANTS** defendant's cross-motion for summary judgment. Plaintiff's complaint is **DISMISSED**. Each party shall bear its own costs. The clerk of court shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge